JESSE BAILEY et al., Complainants-Appellants, v. TOM GREER, County Judge, et al., Defendants-Appellees.—468 S.W.2d 327.

Middle Section. March 10, 1971.

Rehearing Denied March 26, 1971.

Certiorari Denied by Supreme Court June 7, 1971.

14

Frank N. Seal and Randall L. Nelson, of Collins, Seal & Rucker, Chattanooga, for complainants-appellants.

Proctor Upchurch, Pikeville, and T. A. Greer, Jr., Dunlap, for defendants-appellees.

PURYEAR, J. This appeal involves a rather spirited dispute over the question of whether or not the Quarterly County Court of Sequatchie County legally passed and adopted a resolution at a session of said Quarterly Court on April 3, 1970, which would authorize the issuance of approximately $142,000.00 in short term notes.

The complainants in this case, Jesse Bailey, Taft Harvey, B. W. Johnson, Standefer Grant, J. O. Wilson, Maynard Lewis, Reece Smith, Tommy Johnson and Ralph Sims were all duly elected as Justices of the Peace in Sequatchie County quite some time prior to April 3, 1970.

The defendant, Tom Greer, was elected as County Judge of Sequatchie County and was duly qualified and acting County Judge of said County on April 3, 1970. The defendants Hugh B. Pittman, R. D. Shephard, T. H. Austin, Edward Harmon, Charles Seals, Charles Alton Hudson, E. L. Smith and W. H. Condra were also elected as Justices of the Peace in Sequatchie County prior to April 3, 1970.

The original bill filed in this case on April 7, 1970, avers that on March 23, 1970, a special meeting of the Quarterly County Court of Sequatchie County was duly called and held at the courthouse in Dunlap, the county seat, to consider the approval or disapproval of a contract between Sequatchie and Bledsoe counties relative to the establishment of a joint public school for academic and vocational education and to further approve or disapprove the issuance of $142,000.00 in short term notes to partially finance the construction of said school.

The bill further avers that said matter was voted upon with a vote being recorded of eight against and six for,

with the other members of the Court being absent or abstaining from voting; that after considerable activity by numerous people in the community, another special called meeting was set for April 2, 1970, for the purpose of reconsidering the action previously taken on March 23, 1970; that at the said meeting on April 2, 1970, a quorum failed to appear and that meeting was adjourned until the evening of April 3, 1970.

The bill further avers that the total membership of the Quarterly County Court at the time in question was eighteen Justices, but that on April 3, 1970, before the meeting was held that evening, the defendant, Tom Greer, County Judge, obtained the resignation of Squire Charles L. Stewart, one of the Justices, and that when the meeting was held on April 3, 1970, seventeen members of the Quarterly County Court were in attendance, at which meeting the resolution which failed to pass on March 23, 1970, was reconsidered and eight of the justices present voted for adoption of the resolution and nine Justices voted against the adoption thereof; that the defendant, Tom Greer, County Judge, thereupon refused to record the "No" votes of Squires Jesse Bailey and Taft Harvey, and also refused to consider Squire Stewart as a member of the Court for the purpose of ascertaining a quorum, and then declared that the total membership of the Quarterly Court, at that time, consisted of fifteen Justices, with eight voting for the resolution and seven against the resolution, after disallowing the votes of Squires Bailey and Harvey upon the grounds that these two Justices had removed from the Districts in which they had been elected and thereby vacated their offices.

In said bill, complainants aver that the resignation of Squire Charles L. Stewart had not become effective on April 3, 1970, and Squires Bailey and Harvey had not removed themselves from their respective districts and therefore, said resolution was not legally adopted at the meeting on April 3, 1970.

It is further averred in the bill that the defendant, Charles Seals, had accepted the office of Deputy Sheriff, removed himself from his District to the County Jail, was serving in that capacity on April 3, 1970, and therefore, had vacated his office as a Justice of the Peace and his vote for the resolution should not have been counted.

The bill was later amended so as to aver that the defendant, Tom Greer, was sued in his official capacity as County Judge and the remaining defendants were sued in their official capacity as members of the Quarterly County Court of Sequatchie County and also amended so as to aver that Squire Charles L. Stewart should have been counted as one of the members of the Quarterly County Court on April 3, 1970, since no person had been elected to succeed him and therefore he continued to hold the office of Justice on April 3, 1970.

The bill prays for proper process, for a decree declaring the action taken by the Quarterly County Court on April 3, 1970, null and void; for an injunction enjoining and restraining the defendants from taking any further action pursuant to the resolution considered on April 3, 1970, and for general relief.

The defendants answered the bill, admitting in their answer that the complainants had all been elected as Justices of the Peace in Sequatchie County and denied

that on April 3, 1970, Jesse Bailey, Taft Harvey and Charles L. Stewart were members of the Quarterly County Court and specifically averring that those three persons should not be counted for the purpose of determining the membership of the Court on April 3, 1970.

Also, as a part of said answer, the defendants filed a cross-bill in which they averred that for over one year prior to April 3, 1970, the complainant, B. W. Johnson, had been serving as a deputy sheriff of Sequatchie County, and was serving in that capacity on April 3, 1970, and therefore, he had vacated his office as Justice of the Peace and was not entitled to cast a vote on matters in issue before the Quarterly County Court.

Complainants filed an answer to said cross-bill in which they admitted that the complainant, B. W. Johnson, had acted as deputy sheriff, but averring that he was not acting in that capacity on April 3, 1970, and further averring that the failure on the part of the Quarterly County Court to declare his office vacant on April 3, 1970, had the effect of leaving the membership of the Court unaffected by complainant Johnson's former service as deputy sheriff.

On April 13, 1970, the case was tried before the Honorable L. F. Stewart, Chancellor, upon oral testimony and documentary evidence as a result of which the Chancellor entered the following decree:

"This cause came on to be heard this 13th day of April, 1970, before the Honorable L. F. Stewart, Chancellor, at Dunlap, Tennessee, upon the original petition as amended, the Answer and Cross-complaint of defendants, and the Answer to the Cross-complaint, the testimony of witnesses heard in open Court, various

exhibits and stipulations, and the entire record in the cause, from all of which the Court finds that the issues were essentially narrowed to the following propositions.

1. Had the complainants Jess Bailey and Taft Harvey removed themselves from their respective districts wherein they were elected to the Sequatchie County Quarterly Court or was the action of the County Judge in removing said complainants arbitrary and illegal.

2. Did the resignation of Charles L. Stewart terminate his responsibility as a Squire of the Sequatchie County Court so as to prevent him from voting and his position from being counted toward a quorum prior to the time that his successor was duly elected and qualified.

3. Did Charles Seals and B. W. Johnson vacate their positions as Justices of the Peace of the Sequatchie County Quarterly Court by accepting the office of Deputy Sheriff.

4. Was the removal of Squires Bailey and Harvey and the resignation of Squire Stewart properly considered at the Special meeting of April 3, 1970.

After consideration of all the evidence and the argument of counsel for the respective parties, the Court finds that Jess Bailey and Taft Harvey, prior to April 3, 1970, removed from the Civil District wherein they were elected as Justices of the Peace, and that such removal was a change of residence in violation of Section 19-112, Tennessee Code Annotated, and by doing so, they were not members of the Sequatchie County Quarterly Court of April 3, 1970.

The Court further finds that Charles L. Stewart properly resigned from the County Court of Sequatchie County prior to the meeting of April 3, 1970, and his resignation terminated his right to vote at said meeting and prevented his position from being counted towards a quorum of said Court.

The Court further finds that B. W. Johnson and Charles Seals were, prior to the meeting of April 3, 1970, acting as Deputy Sheriffs, in violation of Section 19-111, Tennessee Code Annotated, and thereby vacated their positions as members of said County Court.

The Court further finds that the removal of Squires Bailey and Harvey and the resignation of Squire Stewart were properly considered at the meeting of April 3, 1970.

The Court further finds that as of the meeting of April 3, 1970, the Sequatchie County Quarterly Court was composed of thirteen (13) members, and that seven of these members would be a majority of said County Court as properly constituted.

IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED that Jess Bailey, Taft Harvey, B. W. Johnson, and Charles Seals, for the reasons hereinbefore cited, were not members of the Sequatchie County Quarterly Court on April 3, 1970, and were not entitled to vote upon the matters placed before the Court at the special meeting of April 3, 1970.

Further, that Charles Stewart, prior to the meeting of April 3, 1970, did properly resign and was not a member of the Sequatchie County Court and was not entitled to vote upon the matters before the Court at

the special meeting of April 3, 1970. Further, that the Sequatchie County Quarterly Court is properly composed of thirteen (13) members, and since seven (7) of these members voted in favor of the resolutions before the Court in its special meeting of April 3, 1970, that said resolutions were properly passed.

The costs of this cause are adjudged against the complainants, for which execution may issue if necessary.

To the actions of the Court, all parties adversely affected properly excepted and are granted thirty (30) days in which to effect their appeals.

ENTER this 25 day of April, 1970.''

(Tr. pp. 23-25 Tr.)

From the foregoing decree the complainants prayed and perfected their appeal to the Supreme Court and that Court has transferred the case to this Court since there are some questions of fact involved therein.

Complainants have filed three assignments of error which are as follows:

I

''The Chancery Court erred in holding that the resignation of Squire Charles L. Stewart on April 3, 1970, prior to the meeting held on said date, terminated his right to vote at said meeting and prevented his position from being counted towards a quorum of said Court.

II

The Chancery Court erred in ruling that Squire Jesse Bailey had removed himself from his district, so that he was no longer a member of the Sequatchie County Quarterly Court on April 3, 1970.

### III

The Chancery Court erred in ruling that Squire Taft Harvey had removed himself from his district, so that he was no longer a member of the Sequatchie County Quarterly Court on April 3, 1970.''

The trial Court's conclusion that Squires B. W. Johnson and Charles Seals had vacated their offices as Justices of the Peace by serving as Sheriff's deputies is not assigned as error by any of the parties.

It is conceded by the parties that on April 3, 1970, the total authorized membership of the County Court of Sequatchie County was eighteen Justices of the Peace and that Squires Charles Leon Stewart, of the Third Civil District, Jesse Bailey of the Sixth Civil District, and Taft Harvey of the Seventh Civil District had been elected as Justices of the Peace in their respective Districts.

It is also conceded that at the meeting of the County Court on March 23, 1970, the proposed resolution to authorize the building of a school jointly with Bledsoe County and authorize issuance of $142,000.00 in short term notes failed to pass, and that a legal quorum failed to attend the special meeting of the Court on April 2, 1970, which was called for the purpose of reconsidering such resolution.

It is also conceded that the meeting was then adjourned until the evening of April 3, 1970, at which seventeen Justices were in attendance, Squire Charles Leon Stewart being the only Justice absent at that time; that at this latter mentioned meeting eight Justices voted for said resolution and nine voted against it, Squires Bailey and Harvey being among those who voted against

it; that the County Judge, having previously announced the resignation of Squire Stewart, then declared that Squires Bailey and Harvey had vacated their offices by removing from their Districts, therefore, the total membership of the Court was fifteen Justices; that the votes of Squires Bailey and Harvey would not be recorded and therefore, the resolution passed by eight votes for it and seven votes against it.

Squire Stewart testified that soon after the meeting on March 23, 1970, he began to consider resigning and finally, about April 2, 1970, he decided to resign and told the County Judge that he intended to do so, and then at some time on April 3, 1970, prior to the meeting on that date, he submitted his resignation, which was then accepted by the County Judge.

Under their first assignment, complainants insist that, although Squire Stewart had resigned, he was still a member of the Court when the meeting was held on April 3, 1970, and should have been included and counted for the purpose of determining the presence or absence of a quorum.

In support of this insistence, they rely upon certain language in Article 7, Section 5 of the Constitution of Tennessee and T.C.A. Section 8-1804:

Article 7, Section 5 of the Constitution is as follows:

"Elections for Judicial and other civil officers shall be held on the first Thursday in August, one thousand eight hundred and seventy, and forever thereafter on the first Thursday in August next preceding the expriation of their respective terms of service. The term of each officer so elected shall be computed from the

first day of September next succeeding his election. The term of office of the Governor and of other executive officers shall be computed from the fifteenth of January next after the election of the Governor. No appointment or election to fill a vacancy shall be made for a period extending beyond the unexpired term. *Every officer shall hold his office until his successor is elected or appointed and qualified.* No special election shall be held to fill a vacancy in the office of Judge or District Attorney, but at the time herein fixed for the biennial election of civil officers; and such vacancy shall be filled at the next Biennial election recurring more than thirty days after the vacancy occurs.''

Tennessee Code Annotated Section 8-1804 is as follows:

''The term of each judicial and civil officer shall be computed from the first day of September next succeeding his election. No appointment or election, to fill a vacancy, shall be made for a period of time extending beyond the unexpired term. *Every officer shall hold his office until his successor is elected or appointed and qualified.* No special election shall be held to fill a vacancy in the office of judge or district attorney, but at the time fixed for the biennial election of civil officers; and such vacancy shall be filled at the next biennial election occurring more than thirty (30) days after the vacancy occurs.''

We have italicized for emphasis, the specifiv language upon which complainants rely.

In support of this proposition complainants also cite United States ex rel. Watts v. Justices of Lauderdale County, 6 Cir., 10 F. 460.

The opinion in that case was written in 1882 by the Honorable E. S. Hammond, United States District Judge for the Western District of Tennessee, and that opinion must be weighed and considered in the light of its factual background which is stated therein as follows:

"The relator recovered a judgment in the Circuit Court of the United States against Lauderdale County for $25,664.32, interest and costs, on bonds and coupons issued by the county in aid of the Memphis Paducah & Northern Railroad, which judgment was affirmed by the Supreme Court. The Circuit Court thereupon issued a peremptory writ of mandamus requiring the 26 justices of the peace composing the County Court to levy a tax as other taxes were levied, and to collect the same, to pay the judgment. In order to evade obedience to the writ 21 of the justices tendered their resignation to the County Court, which were accepted, leaving the county without a quorum in the court authorized to levy the tax. This was not done until service upon them of the writ of mandamus, nor until they had assembled and proposed to the attorney of relator negotiations for a compromise, which ultimately failed. The affidavits disclose a conflict of evidence between the attorney and the justices as to what transpired at the time of the meeting of the justices, they insisting that he waived or excused a levy, and agreed to submit the proposition for compromise to his client, while he insists he did not interfere with the writ, but only agreed to submit a proposition to his client on their undertaking to make a levy either at that term or an adjourned term to be held for the purpose. The court was adjourned to a subsequent day, when the relator's refusal of the compromise was presented,

and, being received, the justices resigned in sufficient numbers to leave the court without the number required to make a levy. The sheriff of the county has never held elections to fill the vacancies, as required by law, and the affidavits show a condition of great public hostility to any levy of a tax, and a determination of the people and the officers to do all in their power to escape payment of the bonds, which are claimed to be fraudulent, notwithstanding the decision of the Supreme Court in favor of their validity.

The relator served this rule upon the justices to show cause why they should not be punished for contempt of the process of the court, claiming that the act of resignation was a contempt, and that the constitution continued the resigning officers in office until their successors are qualified. The defendants answer the rule by setting up their right to resign as a defence, and excusing their failure to comply with the writ before the resignation on the ground of the agreement with the attorney of the relator. Some of the justices swear that they resigned on account of bad health and other causes not connected with the mandamus proceedings, while others rest alone on the legal right of resignation."

Supra, p. 461.

The legal conclusions expressed in that opinion extend beyond the legal propositions necessary for disposition of the case. In said case, the ultimate conclusion reached was that, where Justices of the Peace had previously been served with mandamus to perform a duty, they could not avoid the performance of the command of the writ by resignation because, under Article 7, Section 5 of

the Constitution of Tennessee, the power to act remained in them from the date of their resignation until the designation of their respective successors.

In short, the District Court held that the duty to obey the mandamus continued as long as the power to obey continued, in other words, until election of successors.

Other than the continuing duty to obey a mandamus the effect of a resignation upon the occupancy or vacancy of the office, or their exercise of its powers were not involved in United States ex rel. Watts v. Justices of Lauderdale County and the opinion must be considered in this light.

Furthermore, we find the complainants' interpretation of the effect of that opinion to be in conflict with T.C.A. 8-2801 and also find that the District Court's opinion was not followed in a later opinion of our Supreme Court.

The case of State ex rel. Bergshicher v. Grace (1904), 113 Tenn. 9, 82 S.W. 485, involved the resignation of a member of the board of supervisors of the City of Memphis and in holding that such resignation created a vacancy, the Supreme Court said:

"The constitutional and statutory provisions in Tennessee, providing that every officer shall hold his office until his successor is elected or appointed and qualified, do not apply to cases of this character.

The object of these provisions was to change the common law, by which the official life of all officers elected for a limited time ended upon the expiration of such term, *and authorize, not compel,* officers to hold their offices until their successors are qualified; * * *'' (emphasis supplied)

Supra, p. 17, 82 S.W. p. 487.

Although acceptance of the resignation is not challenged in the assignments of error, we find that in Murray v. State ex rel. Luallen (1905), 115 Tenn. 303, 89 S.W. 101, the Supreme Court held that the County Judge or Chairman of the County Court, is the proper officer to receive and act upon the resignation of a Justice of the Peace.

When such an officer resigns and says in effect, "I cannot or will not continue to carry this responsibility which has been placed upon me," and then follows such resignation with his refusal to attend a session of the forum to which he has been elected, he sheds the responsibilities of the office and the obligation to perform its functions. Until his successor is qualified, the office is vacant for most purposes. However, until the successor is qualified, the officer who resigned may (not must) exercise the prerogatives of the office. If he does not see fit to do so, then no one may claim any right grounded upon his supposed continuance in the office wherein he refuses to function.

■ In the present case, Squire Stewart's resignation was accepted and he has not in anywise attempted or offered to exercise his functions, either by attendance or voting. Thus, by his own voluntary act of resignation and failure to function, his office was, on the date of the meeting in question, vacant.

For the foregoing reasons, we respectfully overrule the first assignment of error.

The factual issues raised by the second and third assignments are whether or not Squires Bailey and Harvey

vacated their offices prior to April 3, 1970, by removing themselves from their respective Civil Districts wherein they had been elected as Justices of the Peace.

The evidence shows that from the time he was elected in August, 1966, until some time in 1967, Squire Bailey lived on a tract of land which he owned in the Sixth District in a community known as "Daus"; that in 1967 he married and that he and his wife Maebell Bailey, purchased a residence in the Fourth Civil District about one mile north of Dunlap, the County seat. This property was conveyed to them as tenants by the entireties on June 6, 1967, and since that time they have lived together as husband and wife on this property.

However, he continued to vote at Daus, to receive his mail there, and do some farming and gardening on his property there and left his furniture and some of his clothing in the house at Daus and occasionally spent a night there. He had steady employment at a factory in Dunlap and for about three months he allowed a Mrs. Patterson and her family, who had lost their home by fire, to live in his house at Daus.

On cross-examination, he testified as follows:

"Q. Where did you take your meals and sleep during that time?

A. At home.

Q. That's right, at home here in Dunlap that you referred to just north of town, that's right, isn't it, and you've considered that your home and everybody in the county knows it, isn't that true?

A. No, it isn't.

Q. I know you maintain and everybody knows you maintain another home, all I'm saying is a home where a man lives and that's where you nodded your head northward on the stand just now, didn't you?

A. I guess so."

(B. of E. p. 25)

During the time in question he told several people he lived in Dunlap.

In her testimony, Mrs. Bailey referred to the place in the Fourth District near Dunlap as "home" and referred to the place at Daus as "the other house."

The evidence shows that from the time Squire Harvey was elected in August, 1966, he and his wife continued to live in the Seventh Civil District on a farm owned by Mrs. Harvey until December, 1969, when Mrs. Harvey conveyed that farm to Mr. and Mrs. Fred Womack, but Squire Harvey kept a farm which he owned in that District but which has no house on it.

In exchange for conveyance of her property in the Seventh District, Mrs. Harvey acquired a residence in Dunlap, to which they moved in December, 1969, but Squire Harvey continued to get some of his mail at his mother's home in the Seventh Civil District, where he spends most of his time, since the mother is 87 years old and it is necessary for someone to be with her, and he continues to farm the land which he still owns in the Seventh District.

At the time of trial Squire Harvey was in a hospital and therefore did not testify, but Mrs. Harvey testified on cross-examination that she lived in the town of Dun-

lap and that she and Squire Harvey continued to live together as husband and wife.

The constitutional and statutory provisions which must be considered in disposing of the second and third assignments are Article 6, Section 15, Constitution of Tennessee, and T.C.A. Sections 19-112 and 8-2801, which are as follows:

Article 6, Section 15:

"Justices of the Peace shall be elected for the term of six, and Constables for the term of two years. Upon the removal of either of said officers from the district in which he was elected, his office shall become vacant from the time of such removal."

"19-112. *Removal from district.*—Justices of the peace shall vacate their offices by removing from the districts in which they were elected; and a justice shall be liable to a penalty of fifty dollars ($50.00) for acting officially after such removal, to be recovered by any one suing for the same, before any justice of the county in which the offender resides."

"8-2801. *Causes of vacancies.*—Any office in this state is vacated:

(1) By the death of the incumbent.

(2) By his resignation, when permitted by law.

(3) By ceasing to be a resident of the state, or of the district, circuit, or county for which he was elected or appointed.

(4) By the decision of a competent tribunal, declaring the election or appointment void or the office vacant.

(5) By an act of the general assembly abridging the term of office, where it is not fixed by the Constitution.

(6) By the sentence of the incumbent, by any competent tribunal in this or any other state, to the penitentiary, subject to restoration if the judgment is reversed, but not if the incumbent is pardoned.

(7) By due adjudication of the incumbent's insanity.''

Of course, the question of whether a Justice of the Peace has removed from the District wherein he was elected is a question of fact. State ex rel. Cannon v. Lee (1911), 124 Tenn. 385, 136 S.W. 997, and we review the evidence de novo pursuant to T.C.A. 27-303 with the usual presumption that the decree of the trial Court is correct unless the preponderance of evidence is otherwise.

The cases in which the words ''residence'' and ''domicile'' have been construed, and sometimes distinguished, for the purpose of determining situs of personal property for taxation or administration of a decedent's estate or for determining jurisdiction in divorce suits do not furnish appropriate guidelines which we can follow for the purpose of determining whether or not a Justice of the Peace has vacated his office by ''removal'' from the District wherein he was elected.

We find no reported case in Tennessee which furnishes a legal precedent for deciding this question, but other States have statutes similar to T.C.A. 19-112 and the Appellate Courts of those States have held that under such statutes ''removal'' is a ''change of place, especially of habitation.'' State ex rel. Van Den Eynden v. Paulson, 29 Ohio App. 121, 162 N.E. 653; Larson v. Bunch, 208

Okl. 278, 255 P.2d 486; Prather v. Hart, 17 Neb. 598, 24 N.W. 282; Vol. 36A Words and Phrases at page 591.

In State ex rel. Van Den Eynden v. Paulson, supra, the Court of Appeals of Ohio, had under consideration a claim that a member of the Board of Education of St. Bernard city school district had vacated his office by removal from such district and the evidence showed that such school board member had established a residence in another district, wherein he was sending his two minor children to a public school, but claimed that he still owned a residence in St. Bernard, had some furniture in it and expected, at some future time, to return to St. Bernard.

In construing Section 4748 of the General Code of Ohio the Court said:

"Section 4748, General Code, deals with vacancies in any board of education. The pertinent part of the section provides that:

'A vacancy in any board of education may be caused by * * * removal from the district. * * *'

The lexiocographers define removal as a change of place, especially of habitation.

The court is of opinion that, under the facts in this case, the relator removed from the district within the meaning of the statute."

Supra, 162 N.E. p. 653.

We are convinced that under Article 6, Section 15 of the Constitution, T.C.A. Sections 19-112 and 8-2801, a Justice of the Peace is required to reside in the District wherein he is elected in order to remain in office and upon his changing his place of residence to a place outside

that District, the office to which he was elected thereupon becomes vacated and he is no longer entitled to perform the functions of such office.

In Whitehead et al. v. Clark et al. (1922), 146 Tenn. 660, 244 S.W. 479, and in Ashcroft v. Goodman (1918), 139 Tenn. 625, 202 S.W. 939, it is said: "A vacancy in office, for any of the causes enumerated in the statutes, occurs usually at the time of the happening of the event whose occurrence is by the statute the cause of the vacancy, and no judicial determination that a vacancy has occurred is necessary."

With the exception of copies of two deeds, the material and determinative evidence on these issues of fact consists entirely of oral testimony which was heard by the Chancellor in open Court where he saw and heard the witnesses and observed their demeanor on the stand and was, therefore, in a much better position than we are to determine the weight to be given their testimony.

In Roberts v. Ray (1959), 45 Tenn.App. 280, 322 S.W. 2d 435, and Clardy v. Clardy (1939), 23 Tenn.App. 608, 136 S.W.2d 526, it is said that the trial Court's findings are entitled to great weight in a case where he saw and heard the witnesses, and observed their manner and demeanor on the stand, and is, therefore, in much better position than the Appellate Court to judge the weight and value of their testimony.

■ After carefully reviewing all of the evidence in this case, we have concluded that it does not preponderate against the decree of the trial Court. Therefore, the second and third assignments of error are respectfully overruled.

■ Although the matter is not mentioned by any of the parties, the seven legal votes in favor of the resolution do not constitute a majority of the total authorized number of eighteen Justices, it, nevertheless, complies with the requirement of T.C.A. 5-509, which is as follows:

"5-509. *Majority required to transact business.*—A majority of all the justices constituting the quarterly county court, and not merely a majority of the quorum, shall be required to elect county officials required by law to be elected by the quarterly county court, to fix salaries, to appropriate money and to transact all other business coming before the quarterly county court in regular or special sessions."

The above quoted Section has been construed by our Supreme Court as meaning a majority of the actual membership at the time in question instead of a majority of the total authorized membership. Beckler v. State (1954), 198 Tenn. 372, 280 S.W.2d 913, and Whitehead v. Clark, supra.

All of the assignments of error having been considered and overruled, the decree of the trial Court is affirmed and the case will be remanded to that Court for the enforcement of such decree and for such other and further proceedings, consistent with this opinion, as may be necessary and proper. The complainants-appellants will pay all of the costs of this appeal.

Shriver, P.J. (M.S.), and Todd, J., concur.

OPINION ON PETITION TO REHEAR

Puryear, Judge.

The complainants-appellants have filed a respectful petition to rehear, but such petition is merely a re-argu-

ment of the same matters which were considered by the Court in its original opinion.

No new argument is made, no additional authority cited and no new fact is pointed out as having been overlooked.

Therefore, the petition to rehear is respectfully denied.

Shriver, P.J. (M.S.), and Todd, J., concur.